Adkisson Sherbert & Associates, Mr. Huth? Huth, Your Honor. Huth. I got it right. Since we have a cross-appeal here, just so everybody's clear, you'll make your initial presentation, then the folks from Adkisson Sherbert will make theirs, and you'll have rebuttal, then they'll have rebuttal. So we're all clear. Thank you, Your Honor. Please proceed. May it please the Court, my name is Carl Huth. I represent Prospect Capital Corporation. I'm here with my colleague today, Adam Burton. And since several issues are raised on appeal, I thought I would group them in order of first the standard of review, and I believe we can start with dispositive legal issues that the Court should review de novo, and then move into the issues of fact, which are reviewed under a clear error standard. The key legal issue, and where the Court got it wrong, in fact, it doesn't cite any of the governing law in this case, is the longstanding North Carolina state precedent, and North Carolina rules of contract law govern the enforcement of a settlement agreement, that says that where the parties express a clear intent not to be bound until all parties have signed and delivered an agreement, then the agreement shall not be enforceable, and no binding obligation shall be created until all parties have executed. And where was that expressed in connection with the alleged oral agreement? It is undisputed, Your Honor, that during that November 22nd conversation, both attorneys understood and discussed that there would need to be a writing, and that Prospect was particular about the terms of its writing. The writing was then created, and on December 1st, Okay, but I'm going back to the oral discussions and the alleged oral agreement. Where's the evidence in the record that as a part of those oral agreements, anybody ever said or made a part of the alleged oral agreement, by the way, we don't have an agreement until we have a writing? Both Mr. Tepper, the counsel for Prospect, and Mr. Sharpless, counsel for ASA, testified, and ASA has conceded in its opposition brief that at the time of that conversation, there was an understanding a writing would be put together and executed. I understood that. Beyond that, there was not any degree of specificity in the record as to what that means, but the intent of the parties is undisputed to have a writing. But that's not unusual, atypical. Parties all the time agree orally and then decide to moralize that agreement in writing. That doesn't mean that it was contingent on the execution of a writing. That seems to me to be a, well, typically it's a mere formality. Turned out not to be the case here, but. True, Your Honor, and in fact, the North Carolina courts do not consider it to be a mere formality. It goes back to the Carter v. Foster decision, which actually addresses the idea that there may be a preliminary oral agreement that then is superseded by a writing indicating the party's intent. But you see, I'm sorry to interrupt, but even your use of the word superseded, do you realize what you just said? Of course you do. To supersede an agreement means, to my mind, there's an agreement that's going to be replaced by a superseding agreement. And you seem to have just conceded that there was an agreement. And there was going to be a second agreement, which embodied the critical terms of the first agreement. Obviously, that writing that's in the record is not the agreement. And the question, I think, before the district court and before our court is, was there an enforceable oral agreement? And you seem to have just conceded that. Well, Your Honor, let me break that apart. By using the term superseding. Let me break that apart in two pieces. First, I think Your Honor's incorrect that the court enforced an oral agreement. The court found, and it's in the record at 659, and I quote, the court therefore concludes that the parties reached a complete agreement and the terms and conditions are set forth in the agreement executed by ASA. Exactly. So the terms in the written agreement are the paper writing embodied the terms that were agreed to orally. Isn't that what the court said? The court said that the terms and conditions are set forth in that agreement. Are set forth. And that agreement included ASA's agreement to the party's understanding that nothing would be enforceable until it was signed and executed. Which takes me back to my first question. Where in the oral negotiations and the communications to the court and the communications between the counsel, is there any expression of an intent that we don't have an agreement unless and until we have a writing signed by the parties? As I said, both counsel expressed their intent that there would be a writing. That there would be a writing. Yeah, that there would be a writing, but where is the conditional language? That we don't have an agreement until there's an executed writing. That's what sort of plummets in me. I think this goes to the fundamental problem with trying to enforce agreements like this, because anybody can say anything about an agreement. It does. It doesn't tend to happen on complex commercial cases where tens of millions of dollars are being sought for good reason. Here it's not tens of millions. Well, $13 million. That is an issue I'd like to address as well, but I'll table that. The issue of the prejudice. Let me divert a little bit to this now. This case came up. Are you staying within the confines of the record here? I am staying within the confines of the record. And the issue is, by disclosing that settlement number, which Prospect Management believes was far less than they could recover, that we believe that Atticus and Sherbert essentially polluted the district judge's understanding, and he said so. He said so in the record at A464. He said, for this amount of money, I don't want to hear people arguing about words. He went so far as to put it on the record that he believed that amount of money was relevant. We dispute that it is. We think the case was worth hundreds of times as much as that settlement agreement. Now, Carter v. Foster, to answer Judge Davis's question, says where the parties agree on a compromise, but it is contemplated that their agreement will not be binding until it is committed to writing and signed by the parties. Either party has the right to reconsider and repudiate the terms to which he previously agreed, and there is no valid compromise if a party changes his mind and refuses to sign the written agreement. That is precisely what happened here. There was a discussion at which the attorneys said there will be a writing agreement. So are you now arguing that there actually was a change of mind? There's no change of mind. There's a change of position. He just cited language, quoting language. I quoted the language from Carter v. Foster, and what happened I think is clear on the record, that Prospect's attorney went out and negotiated the best deal he could. He put in protective language saying that it would not be binding until signed by the client and delivered to all parties. And you don't contest that the attorney for Prospect had the authority to negotiate a binding settlement? That issue is not before the court. We neither concede nor deny it. Wait a minute. At the district court below, that specific question was asked to either you or whoever is representing Prospect, and they said that we don't contest that he had the authority. What I said, and it's in the record at 465, was that we have not contended that he did not have the authority to settle this case, and that's not an issue before the court, precisely what I just said. The reason we didn't want to get into that is because when you get in a position where the client is accusing the lawyer of doing something that exceeds his authority, you potentially yield the privilege. We have an ongoing case not just against Adkis and Sherbert, but against other defendants in which we had no interest in having our communications with our counsel become part of the record. That was discussed at length, again, at 465 and 466 of the record. If we had raised the authority issue, then it would have been before the court, but it was not, and Judge Cogburn agreed with that below. Now, the cases are clear. But the state of the record is that he had authority. The state of the record is we don't think authority is relevant because the issues before the court are what was said. Assuming he had authority was what was said enough to create a binding moral agreement. My only point is that you've made no contest for our purposes that your counsel had the authority to make a binding agreement. That's correct, Your Honor. Now, the cases are clear that whether there is anything that could be construed as an oral agreement or not, once the parties express an intent, a mutual intent that it will not be final until it is committed to writing,  that is the rule of Parker v. Glossen, 2007 case in the North Carolina Court of Appeals, where the court found when negotiating parties make it clear that they do not intend to be bound by a contract until a formal written agreement is executed. No contract exists until that time. And in this case, the evidence below, the uncontroverted evidence, is that both parties made it clear they had that intent. Six drafts of the written settlement agreement containing the execution and delivery requirement and the merger and integration clause were exchanged. Adkis and Sherbert never contested it. In fact, Adkis and Sherbert executed, signed its name to that. Now, had there been an oral settlement agreement, and had Adkis and Sherbert believed it, then that provision would have squarely contradicted the existence of that agreement. So are we to believe that Adkis and Sherbert, with its vigilant outside counsel, looked at that six times and signed it without ever saying, this is inconsistent with my oral agreement? This is where we get into the question of whether the district court's findings were clearly erroneous and where the district court purported to find facts, the court reviews, and to find whether they are clearly erroneous. The district court found that all material terms were settled as of that oral agreement. The evidence below is uncontroverted that the terms of the release had not yet been settled, that the choice of law, the choice of venue had not been settled, and, most importantly, that the merger and integration clause and the execution and delivery requirement had not, according to Judge Cogburn's findings, been included in that oral settlement. They are plainly material in this case because there is a dispute between the parties as to whether this was binding before it was executed and delivered by prospect. Next, as I stated before, and just to circle back to that, the court actually found that the terms of the settlement agreement are reflected in that draft agreement. And, therefore, it's for this court to look at them de novo and construe them and interpret them consistent with the law, the governing laws of North Carolina, and the rules of Carter v. Foster and Parker v. Glawson and Hilliard v. Thompson are all clear that when the draft agreement includes an instruction that it will not be binding until signed and delivered by all parties, then it is not. What would you have us say to the district judges in this circuit who, as they do, get phone calls from counsel, Judge, can we have an extension? Can we postpone this hearing or get an extension on our response to summary judgment? Yada, yada, yada. We think we can settle this. And then the next day or two days later, the judge gets a call. We settled it, Judge. We're going to complete the paperwork. What's a judge supposed to do? What are we supposed to say to those judges? Well, first of all . . . You're on thin ice, Judge. Your docket management is out the window. Because lawyers can call and say anything they want, anytime they want, represent whatever they want, whether they talk to their clients or not, and you're just out of luck. I don't think that's the instruction, Your Honor. Well, what are we saying to them? Lawyers can't lie to the court. There was no lie said to the court here. In each of those communications, the request was not let's dismiss this case, we've got a settlement. It was let's extend the time I have to file an opposition to Adkis and Sherbert's motion to dismiss. And Prospects Outside Counsel, in both cases, spelled out for the court in those filings what needed to be done. In the first one, and this, I believe, alone, shows that the finding that there was an oral agreement on November 22nd is clear error. Prospects Outside Counsel filed an uncontested motion for extension of time, saying that the negotiations needed to continue until on or about December 1st, plainly showing that as of that date, Prospects Counsel certainly did not believe. The second one was December 29th, 2011. At that point, the statement was that the agreement still needed to be finalized and executed, which is the execution and delivery requirement. The agreement. Yes, that it had to be executed. And that is true on the face of the agreement. Until it is executed, it is not final and binding, and there is no settlement. So until that it was executed, we asked for an additional extension of time to file our opposition. We've asked in this case that if the case is remanded to the judge, that it be sent to a different judge. And as I said, I believe that's because the revelation of this settlement agreement polluted the judge's findings. He referred to it several times, both in his opinion and in his remarks on the record. I quoted before that he said, given this amount of money, I don't want to hear people arguing about words. That, we believe, is entirely improper. Under the Kenning case, it is prejudicial per se to reveal a proposed settlement amount to the jury. And in this case, we believe that it has so infected Judge Cogburn's analysis that he cannot be an impartial arbiter. That's the Lentz case decided by this circuit. And before I conclude my opening remarks, I want to go to the general policy here. We cited the Charamella case in our briefs, the Second Circuit case, that addressed this precise issue. And what Charamella found is that enforcing premature oral settlements against the expressed intent of one of the parties will not further a policy of encouraging settlements. People may hesitate to enter into negotiations if they cannot control whether and when tentative proposals become binding. That's precisely what we see here. A $13-plus million case prospect did everything right, and it's being found that it's binding. Thank you. Mr. Sharpless. Thank you. May it please the Court, I'm Rick Sharpless. I represent Agus and Sherbert Associates in this matter. When I look at a case, I often try to think of a theme that would describe what's happening in the case. And what we see happening now is essentially an argument being made by Prospect Capital that's sort of a, now you see it, now you don't. Let me explain what I mean by that. Prospect Capital's argument, the argument that there was no binding settlement agreement reached on November 22, 2011, rests almost entirely upon the writing that later was exchanged between the parties and provisions that they wished to cite in that writing to prove back that there was no agreement on November 22. That's their now you see it part of their argument. The now you don't part of their argument is, but wait, we never agreed to that writing. It never became effective. If that writing had been signed by both parties and agreed to by both parties, we know we wouldn't be here today. There would have been a dismissal filed. The case would be over. And that is why . . . I thought their argument had an additional nexus, which was the finding of the . . . is the terms and conditions that are in the written agreement that your clients executed. Well, let's look at what the district court said. The district court's order might have been more helpful to us had they set out separately findings of fact and conclusions of law rather than in a narrative form. But if we look at what the court said, and this is on appendix page 658, and speaking about the contract issue in this case, because I think the comment that they're referring to actually comes in their discussion of judicial estoppel. The court says, the first full paragraph, The email spans several months and are indicative that the parties continue to iron out a final agreement, but that the material terms, including payment, price, and cost per side, mutual releases, and a confidentiality requirement were settled during the November 22 telephone call. And if you look at the district court's statements from the bench at the hearing, it was clear that the court was focusing on those provisions of the November 22 telephone call that referenced back to the emails that were part of the records. Release of Agus and Sherbert, associate, no discussion about a release of anyone else, dismissal with prejudice, each side to bear their own costs, confidentiality, and a price that was negotiated in those emails and finally agreed to in that November 22 telephone call. Let's look at some of the other evidence that supports the district court's factual finding, which this court, of course, reviews under the clearly erroneous standard, that there was an agreement reached on November 22, that there was a meeting of the minds. There was no limitation placed on Mr. Tepper's authority. That's at appendix 405 and then again at 465-66. So that's not an issue. Mr. Tepper had the authority to bind his client, that being Prospect Capital. There was no discussion in that telephone call or indeed at any later time, according to Mr. Tepper, that the agreement that was reached on November 22 would in fact be subject to later review or approval. That's appendix 457-458. In fact, Mr. Tepper's testimony was that on November 22, he said we were good to go on the amount. The testimony that was given by me at the district court hearing was that the amount and the terms were discussed. That's really the only daylight between Mr. Tepper's testimony and mine. And then Prospect Capital comes back and says in Mr. Ferraro's testimony, appendix 512, that they were in fact aware during this period of time of the amount that Mr. Tepper was discussing. And that it was not until January that they decided, they being Prospect Capital, that they would not go through with the agreement. This was in response to questions of whether the statements made in the two motions for extension of time were truthful. Prospect Capital said, well, of course they were truthful, because we didn't decide until after that second motion that we weren't going to go through with the settlement. That's at appendix 479 and 483-484. And finally, they do say to the court, they represented to the court, that the problem was the amount. That's at appendix 339. So what do we see as other evidence that supports what the district court does? In the appendix 287 and also at 642, the representations made by Prospect Capital to the district court, that the principal terms, in paragraph two they say that, and that the material terms, they say that in paragraph three, were agreed to. That sounds an awful lot like the North Carolina test for enforcement of a contract. Are the material terms agreed to? Because in North Carolina, if immaterial terms are not agreed to, that does not prevent a court from enforcing a contract. Provided there was a meeting of the minds on the material terms. They also say in their filing at the end of December, appendix 290 and 648, that the same things again, and they say the parties have concluded their negotiations and simply only need to execute the settlement agreement. What does Prospect Capital say? Well, they circle back to what they call the execution requirement that everyone admits was no part of the November 22 discussions that became engrafted upon this document that they eventually did not sign. And they wish to rely on that, and they wish to relate that back to several North Carolina cases, and they correctly state North Carolina law. If the parties agreed that their agreement would not become effective until it was reduced to writing, and in the case of, I believe, the chapel decision, signed by all parties, everyone that needed to sign off on it, then the parties can agree to that, and there is no contract until those things occur. But what distinguishes those cases from this case, and what makes this case congruent with the North Carolina cases that do enforce settlement agreements and oral contracts, is the fact that at no time on November 22, or at any time before November 22, was there any expression by Prospect Capital or by Agus and Sherbert that the agreement, if you will, that the parties were reaching on November 22, was not going to be effective until reduced to writing. What do you make of counsel's argument that your silence in the face of eight, nine, I forget how many drafts of this agreement, that indicated a clear intent to include this counterparts clause as at least some evidence that the parties never intended to be bound until a writing was signed? The district court did not credit that evidence for that proposition, and ultimately it is for the district court to determine as a question of fact what agreement the parties reached, and for this court to review that under the clearly erroneous standard. That evidence, which is an argument that certainly I would expect Prospect Capital to make, were I their advocate, I would make it too, might be some evidence for the proposition that they wish to advance, but it does not vitiate the district court's factual determination based on an abundance of other evidence to the contrary that in fact the parties intended to be bound on November 22nd as a result of the oral telephone conversation. Yes. And it relies fundamentally on Prospect, once again. I think that's one of the most honest answers I've ever heard from a lawyer. I thank you for that. I would also say it goes back to the now you see it, now you don't part of Prospect Capital's argument. As the district court correctly observed, the parties reached an agreement with the material terms agreed to on November 22nd. Thereafter, there were additional terms that were discussed and proposed. There was a choice of law provision. There was that went, I believe, back and forth, the record would show. There was a venue provision that I believe went back and forth. There was a discussion about including ESA in the release. And there were other terms, Bergeron integration clauses and other terms, that were included in this writing. But this writing never became effective. And if this writing had become effective, then we wouldn't be here today because it was a package deal. Either that writing became effective, in which case, we had the settlement that we thought we had, material terms, of November 22nd, or it didn't become effective, which is what happened. And we're right back to the agreement of November 22nd. And that's where the district court went in finding a fact. The second part of the argument. You mentioned this release and the scope of the release and the subsequent negotiations that contemplated an additional party being added to the release. Now, there is North Carolina case law, the Chappelle case, that suggests that if the parties are not in agreement with respect to the scope of the release, that they never in fact intended to be bound. So how do you distinguish that case from this one? That case came out of a mediated settlement conference. There was an agreement signed at the mediated settlement conference that specifically said the parties will negotiate, I believe, a release that will be mutually agreeable. It pointed to that future event as a condition, and I believe it was analyzed as a condition precedent case, that it would be a condition precedent to a contract that the parties agree to a mutually agreeable release, which they, without a doubt, never did. Now, since that was part of the initial agreement, that would be like what didn't happen in this case, which would be had the November 22nd agreement been, we will settle the case for this amount of money with a confidentiality agreement, a dismissal with prejudice, each party to bear their own costs, and a mutually agreeable release to be negotiated, then we wouldn't have an agreement. At least we wouldn't, if the breakdown had been over the negotiation of the terms of the release, we wouldn't have an agreement. But that's not what the November 22nd agreement was, and the district court noted that. The November 22nd agreement, and the evidence that supports this, is the string of emails leading up to that agreement, it was to be a release of Atkinson-Sherbert Associates. Full stop. There was no discussion of a release of anybody else, nor of negotiating an additional release as a condition to the effectiveness of the agreement. That's what distinguishes this case from, I believe, that's the Chapel case that you're citing in North Carolina. Before your time expires, do you want to say something about the cross appeal? With respect to the cross appeal, it is a minor and a technical issue. The Hensley case, which was this court's decision, guidance to the district court on how to assess a settlement agreement, which the district court followed, also says that a dismissal should not be entered, and it analyzed that dismissal as a sanction, that a sanction was not appropriate. And to the extent that a dismissal would be a sanction, that is correct. We say that the Hensley case, however, does not deal with the issue of an agreement that contemplated a dismissal with prejudice as one of its terms where a party refuses to dismiss their case with prejudice. And in the event that Prospect Capital refuses to dismiss its case with prejudice, then following the equitable maxim that the court will regard as done, that which ought to be done, then the court ought to have the ability to dismiss a case. The only other aspect of our cross appeal was in the event that the court were to reverse the district court, there's a motion to dismiss out there that needs to be addressed. Thank you very much, Mr. Brewer. Mr. Huth. Thank you, Your Honor. I want to start with the evidence because that is where Mr. Sharpless spent most of his time. The district court, as we know, found there was an oral agreement on November 22, 2011, and this court reviews that to determine whether it's clearly erroneous or not. And Mr. Sharpless said there was abundant evidence that the oral settlement agreement was reached and final that day. We can test that. The evidence in the record that there was an oral settlement that day are Mr. Sharpless's self-serving testimony and a self-serving email that he sent on November 29, 2011, to which Mr. Tepper, Prospects Counsel, replied two days later with the written draft that was contemplated at initial settlement negotiation. The evidence also clearly shows the objective documentary evidence that Agassiz and Sherbert believed at all times that it needed a final signed, written, documented piece of evidence. On December 21, it said, secure your client's signature and forward a scan. On December 28, it said, sign the settlement agreement to Prospects Counsel. On January 10, they said, we need Prospects Signature ASAP. On January 17, they said, what's up with the settlement documentation? Those are not the questions of a party that believes it has a right and an enforceable settlement based on an oral agreement. The critical one I want to point you to is in the record at 633. This is December 28, 2011, when Agassiz and Sherbert sends its check to Prospect. It says, this check is sent to you as an agent for your client on the express trust that the funds will be held in trust for the benefit of Agassiz and Sherbert & Associates and Continental Casualty Company and will be used for no other purpose until your client has signed the settlement agreement and authorized the delivery of a signed copy to us. That is Agassiz and Sherbert standing on its rights not to be bound until Prospect has signed the settlement agreement. And there is a case directly on point, the Winston case from the Second Circuit, cited in our papers, says that the demand that a payment be held in trust until a settlement agreement is signed confirmed the obvious understanding that the settlement contract would not be effective until signed by both sides. That is precisely what happened here, and the objective documentary evidence was 100% uncontroverted, that at all steps of the process, until Prospect elected to exercise its option under the execution and delivery requirement not to sign the contract, ASA, Agassiz and Sherbert, was completely on board with it and demanded that Prospect comply with the execution and delivery requirement. The evidence, Your Honors, is that both parties intended to have the protection of that agreement and it was not until Prospect actually exercised its right that suddenly Adkins and Sherbert ran to the court and said, Your Honor, everything that Prospect said in those previous motions for extension, which we didn't contest, is no longer true because we didn't have to negotiate any more terms. And in response to the court's questions about whether or not there was a problem, and if so, what was the problem, it came down to money, right? It does, as it often does, come down to money. And money which you didn't contest, your lawyer was authorized to agree on. Well, Your Honor, also in the record is the fact that a large amount of money can make up for a lot of small things. And there were a lot of other things in this document. North Carolina law instead of New York law, which our general counsel testified is our preference in every settlement agreement. The choice of venue, the merger and integration clause. Each of those, and of course the execution and delivery requirement, which has proved to be the most material clause of all. Each of those were negotiated after this oral conversation on November 22nd. And the scope of the release, as Your Honor brings up, from the Chappell case, I think that Mr. Sharpless is reading the Chappell case too narrowly. What he told you is that had Mr. Tepper, Mr. Sharpless said on November 22nd, there will be a release that is yet to be negotiated, that there would have been no agreement that day, as opposed to what actually happened, which is that they didn't negotiate the terms of the release. It would have been an agreement with the condition precedent. Happens all the time. Well, Mr. Sharpless just told you that if they had said it has to be negotiated, then there would be no settlement agreement. I'm drawing a distinction because I believe he's incorrect. I think if you left that open, it would be a condition precedent. But there was no testimony that was left open. Rather, there's testimony that both sides said this will be reflected in a writing. And when that writing came out, it was clear that the parties disagreed about what the scope of the release and other material terms of that agreement would be. What do you say about the fact that Tepper sent the taxpayer identification number? I think Mr. Tepper was helping Mr. Sharpless draft that agreement and put in all the terms, and reserving the right once it was done to send it up the chain, as Mr. Ferraro testified at the hearing, so that it would go to senior management, and senior management would then decide, having seen what outside counsel negotiated, whether to sign the agreement or not, as was their right under Section 10. Doesn't Tepper's behavior, everything he did up until that January 18th or whatever letter, indicate that he believed there was a binding agreement? I don't think it reflects one way or another on Mr. Tepper. I think Mr. Tepper was doing his job. He was told to negotiate an agreement. He said that. He went and negotiated the best deal he could. He preserved the optionality for Prospect not to sign it, and he sent it to senior management for review. The communication was not stellar. I will absolutely give you that. The testimony is that the communication was not stellar. But under Carter v. Foster and Parker v. Glossen, it doesn't matter. Once ASA expressed its intent to be bound by that execution and delivery requirement and relied on it in its communications with Prospect, then that became part of the agreement that is a question of law, and the court should have complied with binding North Carolina precedent. I should say that was also a very honest answer from a lawyer. Thank you, Your Honor. Thank you very much. Mr. Sharpless, you have some time if you wish to use it. Thank you. I'll be brief. The case that we think is controlling is North Carolina National Bank v. Wallins, a decision of the North Carolina Supreme Court. And we've already told the court why we believe that the Chappell decision, which does speak, in fact, to the later agreement or does analyze it as a condition precedent, is distinguishable from this case. So on the contract issue, we think that certainly there was the district court's finding of fact that there was a contract formed on November 22nd to settle this case on the terms described. Dismissal with prejudice, release of Agus and Sherbert associates, each party to bear their own costs, confidentiality agreement, and a number was, in fact, a binding agreement to settle this case. With respect to the cross appeal, I haven't heard much more from opposing counsel about that one. As I said, we do believe that under the Hensley case, which recognized that the court, that enforcement of a settlement agreement is fundamentally an equitable or an exercise of the court's equitable jurisdiction, that in the event that prospect capital were to refuse to dismiss this case following this appeal, that the court does, in fact, have the power to enter a dismissal with prejudice, not as a sanction, but in order to accomplish that which the party agreed. Unless the court has additional questions, we'll rest on the argument in the briefs already submitted. We thank counsel for their argument here. We'll ask the clerk to declare the court in recess until tomorrow, and we will come down and recount.
judges: G. Steven Agee, Andre M. Davis, Albert Diaz